Energy Transfer Partners, L.P. Good afternoon, Your Honors. May I proceed? Yes, you may. Your Honors, may it please the Court? Mr. Armstrong, yes. Yes. Go ahead. My name is Merrick Armstrong, and I'm here on behalf of the appellant in this suit, which is, well, this matter is an appeal from the grant of a summary judgment, and the case being dismissed is a race discrimination case. What gave us pause, Your Honors, and the reason why we brought the appeal is because in several ways, we believe the Court erred when it did not follow the mandate of Rule 56, the Federal Rules of Civil Procedure, in that she did not grant reasonable or consider reasonable inferences in favor of the non-movement, which is my client. And so, Your Honors, we would point out four different ways that we believe that occurred. The first is that the Court, when it was evaluating the nexus between race-based animus and the actions that were taken against my client, basically disregarded a wealth of circumstantial evidence that the United States Supreme Court and this Court, this circuit, has said is relevant, and it can serve as the basis of an inference for a reasonable juror to look at and say that there was race discrimination. What evidence will we find in the record that will show us that your client was treated differently from a similarly situated white employee? Well, and so factually, Your Honor, there is several instances that are throughout the record in many different forms. They're in the form of audio tapes. They're in the form of written notes of a supervisor. They're in the form of e-mails. They're in the form of actual corrective action forms that show that there was a marked difference, a material difference, in the way that my client's supervisor treated him when it came to discipline as opposed to the similarly situated white gentleman. And by way of just kind of factual context, these gentlemen were basically partners. They were hired at the same time by the defendant. They were tasked with doing the same thing. They worked on the same shift. They were essentially a tag team of pipeline controllers. They had the same responsibilities. I thought they had different disciplinary histories. Not materially. Primarily what they were disciplined for were the same set of what the supervisor thought were work infractions. But I thought prior to, I mean, setting that infraction aside, I thought they had, that your client had other Not they were documented. And so what this supervisor basically did is he kept notes. He kept his own personal files on these two employees. And then on July 19th of 2013, the incident that basically triggered him and made him go into his corrective action forms that are the basis of this lawsuit is that the two gentlemen showed up on their work days wearing essentially the same thing, sunglasses, shorts, and T-shirts. He took offense to that, and he said, you can't come to a team meeting dressed like this. Well, it was on their off days, and so they felt like they could. What that supervisor then did was he went back and he looked at every instance and all of his notes that he had ever took exception to something that they did, and he started writing up these corrective actions forms. So it was corrective actions forms that were not handed out gradually over time based on the infractions occurring when they occurred. It was basically documentation of these are all the problems that I've had with you guys. Significantly, there are instances in his notes where the two gentlemen were reprimanded for, you know, and privately counseled for the same behavior, and then when you get to the corrective action form, the African-American gentleman has that on his formal disciplinary action form. The white gentleman does not. There are instances where the same set of, you know, actions were taken as this should be written up in the African-American's corrective action form as this should be taken as a disrespect to myself and, you know, a violation of the rules that's a pattern of behavior. When it comes to the white gentleman's corrective action form, that type of language is completely absent. What essentially triggered this lawsuit was the fact that when that corrective action form was given out, my client disagreed with the contents of it, but he actually signed off on that form. This is back in July of 2013. The white gentleman basically disagreed with it and said, I'm not signing this. You know, he basically, I think part of the supervisor's note says that he basically got unruly and said he's just not going to sign it. He was allowed to go back to work no problem. My client then embarked on a medical leave, and upon his return in January, he was given what appeared to be the same disciplinary action form. It had the same documentation of those issues on it. And he said, hey, I've already signed this. Why do I have to sign it again? Right. He was told at that time that if he didn't sign it, he'd be terminated. And the basis of that termination was communicated to him as, you know, there is a rule that exists. There's a company policy that exists that you have to sign this, you know, corrective action form or you will be terminated. And the appellee will undoubtedly come and say that this was not a termination, it was a resignation, but I think the district court looked at the same evidence that you will see in the record and decided it was a termination. And so that's the adverse action. And so after reviewing all of the evidence and the instances of just the differences between how these two gentlemen were treated, this is what the district court wrote in its opinion. It says, after carefully reviewing appellant's opposition and the appellee's reply, in addition to appellant's motion, the court finds that while appellant has raised genuine issues of material fact for trial regarding whether Bozeman, who is the white similarly situated individual, was similarly situated to appellant, whether appellant was treated differently from the way appellee treated Bozeman, whether appellee's officers created an ex post facto policy and applied it only to appellant when he allegedly violated his rules, and whether he was fired for objecting to and refusing to comply with the ex post facto policy, which didn't exist. And it says, nevertheless, appellant has failed to prove a key element of his cause of action, that the alleged discriminatory treatment of him was based on his race. That's where we find error. Because at the summary judgment stage, as you all know, the standard of proof is not that they have to actually meet their burden. The standard of proof is that they have to have evidence from which a reasonable juror can look. Counsel, your client has been off duty, sick, for a long time. And there have been a lot of changes made in how they follow what goes through the pipeline. And all he had to do was to be retrained. Now, there's nobody that's white or black that was treated any differently than him. I agree with you on that point, Your Honor. And my client agrees with you on that point. If you look at the record, what he actually said to the defendant was, I don't have a problem being retrained. In fact, because of what you stated, Your Honor, he said, I actually think the length of retraining that you guys are assigning to me may be a little bit too short. So he was willing to retrain for even a more extensive period. So that's not the issue. The issue is he was given a second corrective action for the same disciplinary action for which he had signed off on before. Well, there's a long, there's a great deal of difference between coming to a meeting in shorts and, on the other hand, your client had some rather serious problems besides that. So I don't see how you blame any different treatment on the basis of the race of these two men. Because in the first things that they were asked to sign, very different circumstances between the two. And certainly being off from work, you would expect some sort of retraining and to accept it. That's all. I don't see a problem there. And I agree. I agree with you, Your Honor. I think he did accept the retraining aspect of it. His problem was why was he being disciplined a second time and forced to not only discipline the second time for the same behavior, forced to sign a piece of paper or be terminated that the white gentleman was not even, you know, forced to sign the first time around. When he signed it the first time around. And so, and when you say that they were vastly different circumstances, Your Honor, actually they were essentially identical. And I think the district court found that. That they were identical, basically, instances of behavior that they were disciplined for. It was not only the attire, but there was an instance where both Mr. Bozeman and Mr. Mitchell missed a communications between one piece of equipment in the pipeline on one end and the other, that they were both tasked with monitoring. They both missed it. It shows up in Mr. Mitchell's disciplinary action form. It doesn't show up in Mr. Bozeman's. But at the same time, in this supervisor's notes that he kept over time, there is a clear reference that, hey, I counseled privately both of these gentlemen for missing that, you know, piece of that communication on the pipeline. This was their task and they missed it. I thought your client had more severe attendance problems, that he had missed a lot more work. He had attendance issues, but so did Mr. Bozeman. They were different types of attendance issues. What was documented as far as attendance for Mr. Bozeman was that he took breaks for too long. He took frequent breaks. He took too many breaks. He wasn't at his post enough. What was documented for my client was, you know, he overstayed some of his absences, sick absences. And so you're right, Your Honor, those are, you know, different. They depart in the fact that those are different types of behaviors. But I would submit to the Court that those are the only behaviors that were different between Mr. Bozeman and Mr. Mitchell. My memory is not as good as it should be, but I thought when I read the other side's brief, they said when your client did come back from the extended medical leave, that he said he did not think he needed to be retrained. No, ma'am. And, Your Honor, what we've outlined in the summary judgment brief that I think the district court correctly looked at and saw some dissimilarities in the way they were treated is that, you know, there are transcripts of the audio tapes where he basically says, I'm okay with being retrained. I think it's too short of a period of time. I'm not comfortable with whatever it was, the six weeks that they told him he had to retrain. And so the notion that he was terminated because he didn't want to retrain is just not supported by the record in any way, shape, or form, Your Honors. And so in addition to those instances of not taking the same set of facts and allowing circumstantial evidence that the Fifth Circuit and the U.S. Supreme Court has said is good for proving a racial animus, there also was a misapplication of the same actor rule. The court applied the same actor inference but then disregarded circumstantial evidence that the Supreme Court and the Fifth Circuit has said is something that should be considered in order to rebut that. I mean, it's not a non-rebuttable inference. It's not a presumption that can't be rebutted. But the court looked at that, those type of circumstantial things, where I think what's been termed in this circuit as sufficiently egregious conduct, things like firing a person for not complying with a policy that doesn't exist at the time you fired and enforced them based on that policy. Or things like double disciplining somebody and forcing them to sign a disciplinary action form that another gentleman was not even forced to sign the first time around. Those are the type of things that, you know, if it looks like a duck and it quacks like a duck, it's a duck. It's dissimilar treatment for which a reasonable juror could look at that and say the same actor inference is rebutted in this circumstance. And the judge actually made that determination and it should have been left to the jury to do. And one other point on the same actor inference, and I've got 25 seconds and I'll sit down, is that it doesn't even apply procedurally to this case. The guy who supposedly hired him was a different guy from the supervisor who kept these notes and treated them dissimilarly. It was a different person from the person who terminated them, which was an HR representative. With that, I'll sit down. I reserve the rest of my time for rebuttal. Yes, you've saved time for rebuttal. Thank you, Mr. Armstrong. Ms. Edwards. May it please the Court. My name is Kelly Edwards. I'm counsel for the Appalachee Energy Transfer Partners. The record before this Court supports an affirmation of the District Court's grant of summary judgment for three primary reasons, each of which I will address in turn. First, the undisputed evidence demonstrates Mr. Mitchell did not suffer an adverse employment action as a matter of law because he made a conscious decision to end his employment under circumstances that did not rise to the level of a constructive discharge. Second, there is no evidence in the record of disparate treatment under the precedent set by the circuit. And third, there is no other evidence in the record suggesting the company's actions were a pretext for race discrimination, particularly in light of the same actor inference, which does apply in this case. First, we believe the District Court's grant of summary judgment should be affirmed on this appeal because the record demonstrates that Mr. Mitchell's employment ended under circumstances that did not amount to an adverse employment action as a matter of law. As a preliminary matter, there can be no dispute as to whether the July 2013 corrective action issued to Mr. Mitchell was an adverse employment action itself. Counsel referenced that corrective action, and I think it's important to address it even at this stage. This circuit has held that disciplinary warnings without attendant changes in the terms and conditions of employment do not constitute adverse employment actions. And so to the extent that he alleges that the first corrective action that he received in July of 2013 is an adverse employment action, I believe that's unsupported by the law of this circuit. Furthermore, with respect to the end of Mr. Mitchell's employment, as the record demonstrates, when it came time for Mr. Mitchell's return to work following his medical leave, the company asked Mr. Mitchell to sign a document agreeing to the retraining and reoperator qualifying requirement, but Mitchell refused to do so. Was that different from the form he had signed a few months before that? The actual form itself, so the actual communication upon his return to work, was documented in the same basic form. The title of the form was corrective action. But the record is clear that the employer never intended it to be a corrective action in a disciplinary sense. But my question was, were the two forms the same, or were they not the same? The two forms before they were filled out by the supervisor were the same form. That's correct. I'm sorry, I may have misunderstood your question, Judge Smith. When he returned to work, it was a new form with new language. It wasn't, in essence, the same form he was given back in July of 2013 that he was asked to sign again. It was a brand new document with a new communication, new language on that document presented to Mr. Mitchell. Did it refer to the prior incident? It referred to the fact that he had been counseled previously for disciplinary issues. If you view the document itself, which is in the record, the document states at the top that the purpose of the report, this is on page 193 of the record, is to reinforce the expectation that concerns listed in the written corrective action form presented to Frederick on July 19, 2013 have been corrected, and to set the expectation for Frederick's retraining and requalification upon his return to work. And that was the different purpose of that form presented to him. Did it specifically reference the prior incident? It did specifically reference the fact that he had received a corrective action in July of 2013, and it also specifically referenced the fact that the purpose of that was to reiterate that he did have these performance concerns and that the company expected him to behave in a manner that was consistent with their expectation that he correct those behavioral concerns from the past. He declined then to sign saying it was a matter of principle. Is that right? That's correct. The company presented the form to Mitchell because of the retraining and requalification requirement and told him repeatedly that in order to come back to work that he would need to sign the form. And he acknowledges, at page 171 of the record, that he understood that his future employment at the company depended on whether or not he signed the form. Yet he chose not to sign it, instead choosing to end his employment. The evidence in the record demonstrates that had Mr. Mitchell not made the conscious decision not to sign the form at issue, that his employment would not have ended. The only evidence in the record shows that the company assumed Mr. Mitchell would return to work, and the only reason that he did not is because he himself chose to take an action that he knew would end his employment. And so because the record evidence shows that under these facts this was a voluntary termination, a voluntary end of his employment, a job abandonment, if you will, Mr. Mitchell can only demonstrate an adverse action if he can show that he was constructively discharged. And that is that his employment ended under conditions so intolerable that any reasonable employee would feel compelled to resign. In this case, there's no evidence of a traditional constructive discharge circumstance. Was constructive discharge raised or planned? He disputes that it was a constructive discharge. Mr. Mitchell's position is that this was a termination. So I think there is a difference as to the characterization of the facts. And his allegation is that this was an adverse employment action because it was an involuntary termination. Our position is that the facts demonstrate it was not an involuntary termination. In fact, it was a voluntary termination. And so, therefore, the proper analysis is under this Court's constructive discharge line of cases. And even in those cases, this Court has imposed and emphasized repeatedly that that is viewed through the lens of a reasonable employee. So what a reasonable employee would have done under the circumstances. And this Court has found that there is no constructive discharge when a reasonable employee would have taken another action to resolve his employment concerns before merely quitting. Even in cases where employers have given employees an ultimatum to quit or be fired, this circuit has required something beyond that employee's subjective belief that termination was inevitable in order to find a constructive discharge. For example, in the Faruqi case, in which the Court found a constructive discharge, there was evidence that the plaintiff's supervisor told him that he should look for another job and that in a week's time he would be placed on an indefinite leave of absence. There was no such message to Mitchell in this case from his supervisors or anyone else, nor was there any other evidence of the typical circumstances surrounding a constructive discharge. Situations where there's a reassignment or a reduction in responsibilities, harassment, things of that nature. And I think in that way our case is very similar to the case presented to this Court last year in Caldwell v. Lozano, in which the employee resigned instead of responding to his employer's notice that they would terminate him unless he presented additional facts to rebut their suggestion that he had committed a terminable offense. And the Caldwell Court found that there was no adverse action because the plaintiff did not take advantage of a reasonable opportunity afforded to him by his employer to take actions to possibly avoid termination. Just as in that case, here Mr. Mitchell failed to take reasonable steps to avoid his termination of employment. And for that reason, we believe this Court should find that Mr. Mitchell suffered no adverse employment action as a matter of law and affirm the District Court's ruling. But even if this Court finds that there is an issue of fact as to whether Mitchell suffered an adverse employment action, summary judgment is still appropriate on the company's behalf because there is no evidence that Mitchell was treated less favorably than similarly situated individuals outside of his protected class. Now, Appellant argues, as he did just a few moments ago, that he and another employee, Charles Bozeman, were similarly situated because they were coworkers who received written discipline for similar conduct issues displayed in the workplace. And I do want to address the Appellant's point about the corrective action forms because he would have you believe that these two employees committed identical workplace violations and yet their corrective action forms note differences. And that's simply not supported by the evidence in the record. Well, the other employee, though, wasn't even required to sign the form, or at least he declined to sign it. That's correct, Judge Smith, and that's because there was no policy at the company requiring an employee to sign a corrective action form for disciplinary reasons. With respect to this particular instance, if we want to isolate the July 2013 corrective action forms, to the extent that the Appellant is arguing that somehow those differences in corrective actions were inappropriate, I don't think that's supported by the evidence in the record because, as Judge Owen recollected, there were differences in the behaviors of these two employees. Albeit similar, Mr. Mitchell had more egregious violations. He had attendance issues. At the company meeting in question, both employees showed up wearing sunglasses, but Mr. Mitchell kept his sunglasses on for the entire meeting while Mr. Bozeman was not, and that was appropriately reflected in these two corrective action forms. Likewise, on the day in question in which these two missed a critical communication in the Pipeline Control Center, Mr. Mitchell was found playing games on his phone while Mr. Bozeman was attending to the Control Center. So while both of them missed collectively a critical communication, Mr. Mitchell clearly engaged in a greater degree of misconduct in the workplace because he was completely ignoring the Control Centers while he was on the phone. And so my point is that any differences in these July 2013 corrective actions were appropriately reflective of the differences in the misconduct between the two employees at the time. Fasting forward, if you will, to the separation of employment, of Mr. Mitchell's employment, Mr. Mitchell would have this court believe that the two were similarly situated because Mr. Bozeman received a corrective action in July and was not required to sign it. Mr. Mitchell instead was required to sign a notice that was presented on a corrective action form upon his return to work. But the difference is, and I think it's a critical difference and one that this court should recognize under its jurisprudence, is that Bozeman never refused to sign a retraining and requalification requirement in a corrective action form or in any other form, in any other written form, and Mitchell did. This court has recognized repeatedly that for two employees to be similarly situated, they must be employed under nearly identical circumstances, and that the critical analysis in this inquiry is that the plaintiff's conduct that drew the adverse employment decision was nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions, and that's the Paskey v. Fitzgerald case is the most recent case highlighting that standard. And this is the key factual distinction in this case. Mr. Mitchell's employment ended not because of any prior disciplinary issues or any reminder of those disciplinary issues, but because he refused to sign a document confirming his agreement to the company's retraining and reoperator qualifying requirement following his return from leave. And because there's no evidence in the record that Bozeman refused to sign a retraining and reoperator qualifying requirement, nor is there any evidence that Mitchell was treated differently  Summary judgment on energy transfer's part should be affirmed. And I do want to address one point that the court raised in the appellant's argument, and that is about Mr. Mitchell's statements to the company that he did not agree to the retraining and requalification requirement. The evidence in the record, I think, is clear in several places that Mr. Mitchell expressed some doubt or some level of disagreement with the company's requirement that he retrain and requalify when he came back from leave. At first he said, well, I'll retrain, but I don't agree that it should be within 30 days. I think it should be longer than that. And the company made it clear that they needed him to acknowledge his agreement to retrain within the requisite time period. Then he came back and said, well, I'll agree to retrain, but I don't agree to requalify. And then there's another instance in the record where he said, well, I'll agree to retrain on the new systems, but not on the entire system. And I think this emphasizes why the company took the position that he needed to sign an acknowledgement of the training and reoperator qualifying requirement upon his return from leave. In the remainder of my time, I'd like to address why summary judgment should be affirmed, because there is no evidence in the record to overcome Energy Transfer's legitimate, non-discriminatory reason for Mitchell's employment separation, and that is that he refused to sign a document acknowledging the expectations the company had for his continued employment. In order to overcome this stated reason, as the court knows, Mitchell must produce substantial evidence indicating that the company's stated reason is a pretext for discrimination, either through evidence of disparate treatment or by showing that the employer's explanation is false or unworthy of credence. As discussed just a moment ago, Mitchell has no evidence of disparate treatment because he can't identify anyone else who was terminated or who suffered an employment loss for refusing to sign a retraining reoperator qualifying requirement. Furthermore, Mitchell admits that he didn't sign the document presented to him, and for that reason, he cannot claim that the company's stated reason for the employment loss is false. Mitchell's only other evidence of pretext, if I'm understanding the argument correctly, is that the company created a policy and applied it only to him in an effort to discriminate against him. And while that's a colorful theory, it's simply unsupported by the facts in the record. The only evidence, on the contrary, is that the company was motivated by safety concerns and acted in accordance with the obligations imposed by it by the Pipeline and Hazardous Materials Safety Administration, which requires the company to ensure that its pipeline controllers are appropriately trained and qualified, and actually imposes an obligation upon the company to evaluate an individual if the operator has reason to believe that the individual is no longer qualified to perform a covered task. And that's quoted from 49 CFR 195.505. That was the motivation for the company's reason to institute this retraining and re-operator qualifying requirement after Mitchell had missed work for over 20 weeks. Is that documented, that particular regulation? It's in our record. The citation to the regulation is in our record, as is a statement from the supervisor explaining that that regulation controls their business and the rationale for why they adopted that safety requirement, that retraining requirement. And also documented in the record is the company's careful decision and thoughtful decision that this policy of retraining and re-operator qualifying was to apply to any liquids controller who missed work in the control room for six weeks or more. Importantly here, the same actor inference also applies to Mitchell's claims because the undisputed evidence in the record, what the record states, is that the same manager who hired Mitchell is the one that Mitchell is alleging of discrimination. Now, my friend on the other side suggested otherwise to the court a few moments ago, and that was the first time I've heard such an allegation because from the very beginning, Mr. Mitchell himself has presented and claimed that both Christopher Love was the same person who hired him and who was ultimately responsible for the end of Mr. Mitchell's employment to the extent it was an involuntary termination. Certainly he was involved in the circumstances surrounding the separation of employment at issue here. In light of this inference, Mitchell must produce substantially egregious, or excuse me, sufficiently egregious facts to explain why these managers were motivated by discrimination. And there simply is no such evidence in this record. There is none of the traditional evidence that one might see to support a claim for race discrimination. There's no allegation of racial comments. There's no other allegation of any other individual that was inside Mr. Mitchell's protected class being treated less favorably than others. There is simply no other evidence to suggest that any of the managers here acted with a discriminatory animus. And for these reasons, we'd ask that you affirm summary judgment and energy transfers favor. Thank you. All right, thank you, Ms. Edwards. Mr. Armstrong, you've saved time for rebuttal. May I begin? Yes. Okay. I'll start with just reading, I'll start with the issue of whether there was actual termination or involuntary or voluntary resignation. And I'll just read the court's opinion. The court says in its opinion on page 38, which is in the record at record site 451, she wrote, although energy transfer claims that Mitchell voluntarily resigned, energy's internal documents include communications among its employees involved in Mitchell's termination, expressly using the term, and she's got in quote, termination. And she cites the emails that we supplied on summary judgment. It says, moreover, Fowler, who was the HR individual, told Mitchell that she and Chambers were forcing him to sign because of a company policy. When he asked to see a copy, none was provided, and he subsequently learned that no such policy existed at the time. And so this isn't an instance where we're alleging that there was a policy that was created that was created just for him. There was no policy, right? And I think Ms. Edwards has just admitted to the court that at the time Mr. Bozeman was addressed and told to sign his corrective action form, and he didn't sign it. The reason why he went back to work was because there was no policy. When we deposed the corporate representatives of energy transfer, what they told us, and this is in the record as well in summary judgment, is that not only was there no policy at that point, there was no policy when they were lying to my client and saying there was a policy and this is why they were terminating him because he was violating company policy by not signing this particular piece of paper. And so I think the record is clear and the court decided below that this was an adverse employment action. The other thing that I'd just like to point out to the court is that there's never been an allegation on our part that there was a constructive discharge. And so to the extent that that was even raised as a potential allegation in the court's opinion, that's something that just kind of came up out of, I frankly don't know where, because we've never made that allegation, we've always said based on the audio tape and the emails that we had and things of that nature that he was terminated as a result of not signing this piece of paper. As for the same actor inference, there is, and I'll just read from you, and I may not have the time to get this done, but in the record, in the appellant's brief, in the beginning when the appellant begins to talk about the situation of these three individuals who were involved in his termination, the appellee itself outlines that the person who we're alleging had a racial animus against our client was a supervisor by the last name Love. That person is clearly stated in the appellee's own brief as not being the person who hired Mr. Mitchell. That's another individual with the last name Chambers. And the person who terminated Mr. Mitchell was neither of those two. It was an HR person by the last name of Fowler. And so the notion that the same actor inference applies from a purely legal and procedural standpoint, it was a misapplication in the first place. And to the extent it did apply, and the court found that it did apply, based on a reading of the record, there was sufficiently egregious behavior, lying to him about the existence of policies that didn't exist and things of that nature, for a reasonable endurer to look at that and say the reason and the justification for terminating him was false. And as our Supreme Court and as the Fifth Circuit has instructed us, false justifications for taking adverse employment actions can be a basis for a finding of discrimination. With that being said, Your Honors, I appreciate your time in considering my client's appeal. And we ask that, based on the record and everything within it, that you will see that you would reverse the ruling of the district court and render a denial of this summary judgment motion and remand to the district court for further proceedings. Thank you, Mr. Armstrong. Your case is under submission.